58 So.2d 323 (1952)
220 La. 1017
STATE
v.
ROY.
No. 40552.
Supreme Court of Louisiana.
February 18, 1952.
Rehearing Denied March 24, 1952.
*325 A. J. Roy, Earl Edwards, Marksville, for defendant-appellant.
Bolivar E. Kemp, Jr., Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Chas. A. Riddle, Jr., Dist. Atty., Francis J. Gremillion, Sp. Asst. to Prosecutor, Marksville, for appellee.
LE BLANC, Justice.
Defendant, Rellie Roy, was indicted on May 11, 1951 for the murder of her husband, Sylvan Roy, on October 20, 1949. She was arraigned on the same day and pleaded not guilty. After trial on the merits, the jury which tried her rendered a qualified verdict of guilty and on June 8, 1951 she was sentenced to the State Penitentiary for life. The misspelling of the word "capital" in the verdict is made the subject of one of the bills of exception which will be hereinafter discussed.
The shooting occurred on the morning of October 20, 1949. There were no eye witnesses and the only person within hearing distance at the time was a laborer, Zeno Lachney, who lived near the Roy home and who was on the way to his home after helping Sylvan Roy, the defendant's husband, load a bale of cotton. The accused, upon questioning after the shooting, admitted having shot her husband while he was standing on the back porch of their home, as she was moving three guns from the kitchen to another room. The shot pierced a window shade and window pane behind which the deceased was standing, and entered his body about the center of his chest, killing him almost instantly. The accused claimed the shooting was accidental.
At her trial defendant produced only two witnesses in her behalf, her father who arrived on the scene shortly after the shooting, and E. J. Sayer, a youth sixteen years of age, by whom she attempted to establish the fact that the same gun which killed decedent had discharged accidentally on a previous occasion. She did not take the stand.
During the course of the trial, defendant through her counsel reserved several bills of exception and after verdict she filed a motion for a new trial and a motion in arrest of judgment, which motions were overruled by the trial judge. To these rulings defendant's counsel reserved bills of exception Nos. 9 and 10.
Bill of Exception No. 1 is leveled at the overruling of the objection of the defense to proceed with the drawing of tales jurors. As is conceded by defense counsel in brief, the question presented by this objection and exception has become moot since the juror over whom the objection and exception was reserved was later excused for cause.
Bill of Exception No. 2 was reserved to the ruling of the court overruling a motion for a mistrial due to an alleged conversation between the special prosecuting attorney and one of the jurors following the recess of court for the night after the first day of the trial. The trial judge had evidence taken on this motion and from that evidence it was shown that nothing was said concerning the trial, but rather that the juror, upon realizing that the jury would be detained for the night, requested the attorney to deliver personal messages to his wife and mother-in-law. While the conversation was irregular, it appears that it was done in the presence of at least one of the other jurors, in the open court-room, and that no prejudice resulted to the defendant which would have warranted the judge granting a mis-trial.
Bill of Exception No. 3 was reserved to the action of the court in overruling a motion for a mis-trial on the ground that as a result of the previous motion for mis-trial, one of the jurors, A. L. Crow, was displeased and angered and therefore became prejudiced against the accused. The trial judge states in his per curiam that the juror was not prejudiced toward the defendant but had volunteered his testimony at the request of the court, made to all the jurors, in order to enlighten the court as to what had transpired. He states that Mr. Crow was forceful but was definitely not hostile. Under the circumstances, this court is bound by *326 the per curiam of the trial judge and finds no merit in this bill.
Bill of Exception No. 4 was reserved to the court's overruling an objection by counsel for defendant to certain testimony being elicited from the witness, Morris Sayer. The following question was propounded to this witness: "Did you ever hear Sylvan and Rellie, that is Sylvan Roy and Rellie Roy, fuss over Bud Bryant?" The defendant objected to any testimony on this point on the ground that it would be hearsay. However, since the question was asked to show motive on the part of the defendant and since the witness was asked if he had ever heard the defendant and deceased arguing over Bud Bryant, and was not asked to state anything that may have been said during the argument, the testimony was admissible and the ruling of the trial judge was correct.
Bill of Exception No. 5 was reserved to the court's ruling on the defendant's objection to having herself measured in open court before the jury for the purpose of ascertaining her height.
At the time this took place the Deputy Sheriff was testifying and after having stated that at some previous time the accused had told him what her height was, testified that he, himself, had never measured her. It was then that he was asked by counsel for the State to take a measurement of her height, whereupon the objection was urged and overruled.
The objection is based on the ground that by compelling the accused to have herself measured before the jury, her constitutional privilege guaranteed under our Bill of Rights, Article 1, Section 11, Constitution of 1921, was violated. That provision of the Constitution, in so far as it is pertinent to the objection here made, reads as follows:
"No person shall be compelled to give evidence against himself in a criminal case * * *."
The provision is substantially the same as that which appears in the Fifth Amendment to the Constitution of the United States the only difference being that in the latter the phrase "be a witness against himself" is used instead of "give evidence against himself". The difference in phraseology is immaterial however. In his work On Evidence, Wigmore, at Sec. 2263 points out that in interpreting the principle, "nothing turns upon the variations of wording in the constitutional clauses." He then continues: "It is therefore immaterial that the witness is protected by one Constitution from `testifying', or by another from `furnishing evidence', or by another `from giving evidence', or by still another from `being a witness.' These various phrasings have a common conception, in respect to the form of the protected disclosure. What is that conception? Looking back at the history of the privilege (ante sec. 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to extract from the person's own lips an admission of his guilt, which will thus take the place of other evidence."
The question raised by this bill of exception seems to be the one that has frequently been presented to the courts and, as stated in 14 Am.Jur., Criminal Law, Sec. 152, the authorities are not in harmony. It may be that the lack of harmony arises out of the different situations that are presented in the different cases and also the nature of the manner in which the accused is called on to exhibit himself for the purpose of identification or comparison with the evidence introduced at the trial. As pointed out in the text under the section cited, one line of authorities under which a person accused of crime is compelled to exhibit himself for the sake of identification or for any other purpose which tends to aid the prosecution in obtaining a conviction, is in direct conflict with his constitutional rights. On the other hand, the authority states, the rule is that the constitutional privilege or guarantee means that no one will be required to testify against himself and "that no evidence of physical facts can, on any established principle of law or on any substantial reason, be held to come within the letter or spirit of the Constitution." Further *327 it is stated that "The constitutional provision is not violated by compelling the defendant in a criminal case to stand up for the purpose of identification, for every court has the power to require every person who is present as a party or who is a witness under examination to disclose his or her face to the court or jury."
A copious annotation on the subject here under consideration is found in 171 A.L.R. commencing with page 1087. At page 1154 it is stated: "Wigmore, after an exhaustive analysis of the question, emphasizes that the privilege against compulsory self-crimination relates only to testimonial compulsion, and concludes that the proper rule is that an inspection of the bodily features of the accused by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, i. e., upon his testimonial responsibility." Reference is also made in the annotation to the Model Code of Evidence of the American Law Institute, and it is stated that after setting forth the general rule as to compulsory self-crimination (Rule 203), it is prescribed in Rule 205 that "No person has a privilege under Rule 203 to refuse (a) to submit his body to examination for the purpose of discovering or recording his corporal features and other identifying characteristics, or his physical or mental condition." Further, it is remarked that the comment following the rule is to the effect that the trend of the authorities is strongly toward the view expressed in it.
The case of Holt v. U. S., 218 U.S. 245, 31 S.Ct. 2, 6, 54 L.Ed. 1021, impresses us as being one of the leading cases on the subject and there the Supreme Court of the United States ruled that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. * * *", and it referred to the objection made in the case as being one based upon "an extravagant extension of the 5th Amendment."
In Louisiana it would appear from the few cases in which the question was considered that what has been referred to as the trend of authorities supporting the rule that it is not a violation as to compulsory self-crimination to have an accused exhibit himself or parts of his body before the court and jury has been followed. In State v. Prudhomme, 25 La. Ann. 522, the testimony revealed that the tracks of the party who had committed the murder for which the accused was being tried were found near the scene of the crime and to enable the witness who had seen the tracks to state how they corresponded in size to the feet of the accused, the accused was forced to take his feet from under a chair where he had put them. The constitutional privilege was invoked in favor of the accused and in upholding the ruling of the trial court which denied the protection, this court stated: "A mere statement of the facts shows how utterly untenable the objection is. The witness was required to look at the feet of the prisoner in order to testify to facts which might enable the jury to connect the prisoner with the perpetrator of the crime, and we are unable to perceive how any constitutional right of the prisoner was infringed by compelling him to place his feet where they could be seen by the witness and the jury."
The question was again presented in State v. Graham, 116 La. 779, 41 So. 90, 91, and although the Court refers to the fact that the accused had consented to a comparison of the tracks found at the scene of the crime by putting his feet in the tracks, and stated that if he had the privilege of refusing he did not exercise it, it nonetheless seems to have expressed its approval of the rule as stated by Wigmore in his work On Evidence, Secs. 2263, 2265 to the effect that "testimonial compulsion is the kernel of the privilege against self-crimination, and that bodily exhibition and muscular exertion are not within its protecting scope." In making a distinction between a Georgia case Day v. State, 63 Ga. 669, which had been cited and the case it had under consideration the court stated: "The tendency of the more modern *328 cases is to restrict the constitutional privilege against compulsory self-crimination to confessions, and admissions proceeding from the accused, and to open the door to the reception of all kinds of `real evidence,' or proof of physical facts, which speak for themselves."
In State v. McLaughlin, 138 La. 958, 70 So. 925 it was held that a person charged with murder by cutting the throat, was not denied his constitutional privilege of self-crimination in having the scrapings from beneath his fingernails, and his clothing, taken, though against his will, with a view to their being tested for the presence of human blood. State v. Aspara, 113 La. 940, 37 So. 883, is cited as authority.
In the Aspara case the bills were reserved to the over-ruling of an objection to allowing State witnesses to examine certain clothing taken from the defendant after his incarceration, without his consent, with a view of identifying it as that worn by him at the time of his arrest. The objection rested on the same ground of the procedure being in violation of his constitutional right against giving evidence against himself in a criminal case. It was held that the objection was properly overruled. Whilst the procedure did not involve the introduction of any evidence concerning the physical or bodily appearance of the accused we think that in line with the other cases referred to, it indicated the policy of this court in following the trend of authorities which hold that evidence relating to the physical or bodily appearance of the accused, if material, is not in violation of his constitutional right against self-crimination.
Bill of Exception No. 6 was reserved to the ruling of the trial judge in admitting the testimony of the witness, Marion E. Williams, a firearms expert with the Federal Bureau of Investigation, in rebuttal for the State. The objection to this testimony was made on the ground that it was not rebuttal but new and direct evidence and should have been given by the State in chief. In support of this bill counsel relies on Article 379 of the Louisiana Code of Criminal Procedure, LSA-R.S. 15:379. That article does provide that the District Attorney should offer before the introduction of any evidence by the defendant all of the testimony upon which he relies for conviction and not save any evidence to offer on rebuttal as the purpose of rebuttal evidence is to disprove, not to prove. However the article also provides that the application of the rule therein laid down "must rest in the sound discretion of the trial judge."
The principal complaint of counsel for the defendant on which they claim that there was an abuse of discretion on the part of the judge, and therefore prejudice to the accused, seems to be on the point that the expert testified at length on facts about the gun's mechanism and even gave an expert opinion that the indentation of the fired shell caused by the firing pin upon it was obviously a full blow of the gun's hammer. The per curiam of the trial judge on this bill states that the witness was permitted to testify as to what conditions the gun in question could be fired in a cocked position which, he states, was clearly rebuttal testimony since the witness E. J. Sayer had testified on behalf of the defendant that he was unable to remember whether, at the time the gun accidentally discharged in his hands, he pulled the trigger or not. Further, however, the per curiam states that no evidence was admitted pertaining to whether or not the empty cartridge introduced in evidence by the State appeared to have received a full blow of the firing pin of the gun. The statements contained in the per curiam are borne out by the testimony which has been reproduced in the record and under the circumstances we cannot say that the trial judge abused his discretion in any manner whatsoever in permitting this witness to testify as he did.
Bill of Exception No. 7 was taken after the Court permitted the District Attorney in his final argument to use a large device or contraption which he had constructed, to demonstrate to the jury how, according to the measurements and statistics which had been testified to, it was impossible for the gun to have been discharged in the position claimed by the accused, that is, *329 a few inches from the floor after it had fallen from her hands and still have gone through the window 49½ to 50 inches from the floor and struck the deceased in the chest.
From the judge's per curiam it appears that counsel for defendant in his argument to the jury adopted as correct the heights and distances which had been fixed by the State's evidence and he then used a yard stick "some three feet long" to demonstrate how, in his opinion, the shot could have been discharged from a gun in the position the accused claimed it was at the time the shot penetrated the window pane, fifty inches from the floor and landed in the decedent's chest at the point disclosed by the evidence.
The District Attorney in his endeavor, in closing, to rebut that argument, again summarized the facts adduced by the evidence and by using a diagram on a blackboard, graphically demonstrated to the jury that the hole in the window pane, the hole in the decedent's chest and the shoulder of the accused were all on approximately the same horizontal plane. All of this was done and argued without any objection on the part of defense counsel.
Then, in order to objectively and more forcibly demonstrate to the jury the State's theory of intentional shooting as against the theory of accidental shooting which had been argued by counsel for defendant, the District Attorney produced the contraption referred to. It has been brought up with the record in the case and we find it to be a sort of arrangement by which the gun from which the fatal shot was fired can be attached to a stand at the same height from the floor as the shoulder of the accused, all as shown by the testimony. A rod extends horizontally from the barrel of the gun, the corresponding distance from which it was discharged to the place where the deceased stood when it lodged in his chest, all as was also borne out by the evidence.
With this arrangement the district attorney endeavored to demonstrate what path the shot would follow after it left the barrel depending on various positions the stock of the gun was in at the moment of discharge. By raising the stock a few inches at a time, he pointed out that the end of the rod attached to the barrel became proportionately lower until its position was raised to a horizontal level which, he contended, indicated that the stock must have been at or near the same height from the floor as the defendant's shoulder when it was discharged, and not a few inches only after having fallen from her hands to the floor, as had been urged by her counsel in their argument.
The objection of counsel for defendant to the use of this device in final argument before the jury was based on the ground that the procedure was highly prejudicial because the device itself had not been previously offered in evidence and was presented at the time when defendant's counsel had closed their argument and were given no opportunity to rebut the argumentive conclusions drawn from its use by the District Attorney.
The question presented relates to the rule concerning the exhibition of articles before the jury by way of illustration. The rule is thus stated in 23 C.J.S. Criminal Law, § 1091:
"It has been held that counsel cannot use, for illustration, articles which have not been introduced in evidence, at least where he thereby attempts to get such articles before the jury as evidence. However, although such procedure is erroneous where it makes the jury witnesses to the very question involved, as a general rule the exhibition, by the prosecuting officer, of articles of personal property, models, weapons, implements, etc., by way of illustration, and their examination by the jury, is not error, whether the articles are in evidence or not, where, in the latter case, the jury are cautioned that the articles are not in evidence, and that the prosecuting attorney's statements in reference thereto are merely by the way of argument." (Emphasis supplied.)
There are no cases in Louisiana, as far as we have been able to find, bearing on the direct point involved. We find cases from other jurisdictions, however, cited *330 under the rule, and are of the opinion that some of them furnish sufficient authority for us to follow in this case.
One of the cases which we think bears similarity to the present case is that of Herron v. Commonwealth, Ky., 64 S.W. 432, 433. The victim in that case had been murdered by a shot discharged from a pistol and like in this case, there seems to have been some controversy over the position he was in when the shots were fired. Pertinent to the issue under discussion, we quote from the court's opinion:
"In arguing the case to the jury, the commonwealth's attorney had a man stand before it, took an empty pistol, and tried to illustrate to it, from the testimony offered by the commonwealth, that the shots could not have been fired in the manner claimed by the appellant. In doing so he placed the pistol at the head of the subject there to aid in the illustration, and also pointed the pistol at him to indicate how the balls might have ranged up had they been fired when the deceased was lying on the ground. The illustration made was from what he claimed to be the evidence in the case, and he certainly had the right to do so. It was not in the nature of introduction of testimony, but an effort to make an application of that which had been introduced." (Emphasis supplied.)
In People v. Glenn, 96 Cal.App.2d 859, 216 P.2d 457, 463, which involved a prosecution on twelve counts of grand theft, a chart which had been made of the twelve alleged thefts which had not been admitted in evidence was exhibited and objected to on the ground that it did not show that it was a diagram of the contentions of the prosecution and not of the proof. The court then on receiving information that the figures on the chart had been taken from the facts in evidence, overruled the objection. In ruling on the proposition the appellate court stated:
"All parties and the jury knew that the chart was based on the State's evidence. It did not purport to state conceded facts or to determine the truth of the conflicting evidence. The jury was instructed that the chart itself is not evidence in the case. It was used for illustration of the argument only. This was both proper and non-prejudicial."
In further support of its ruling the court then quoted the following from the case of People v. Kynette, 15 Cal.2d 731, 757, 104 P.2d 794, 808:
"Counsel may illuminate his argument by illustrations which may be as various as the resources of his talents."
From Borrer v. State, 83 Tex.Cr.R. 198, 204 S.W. 1003, 1004, we quote the following:
"The state's counsel in the course of his argument drew a rough sketch of the roads, fences, fields, and pastures described by the witnesses, touching the scene of the homicide. It contains no inflammatory matter, did not mark the place where the homicide occurred, but simply delineated the surroundings, including the locality of the house in which the deceased lived, which was shown by evidence, and, according to the qualification, was in accord with uncontradicted evidence with reference to these matters. It was not handled by the jury, but used only as an illustration in connection with the argument. Touching this we quote from Thompson on Trials, § 992, as follows:
"`It seems to be a fair conclusion that it is the right of a party, in arguing to a jury, to use a map or plan which is not strictly evidence in the case, for the purpose of illustrating his argument and explaining to the jury the position which he assumesjust as the teacher makes use of the figures on a blackboard for the purpose of illustration.' Rucker v. State, 7 Tex.App. 549."
We could refer to several more cases from other courts, which have some connection with the matter, but we deem it unnecessary as the only cases we find to the contrary are those in which the article used for demonstration, or the demonstration itself, did not conform to the evidence which had been presented during the trial, as an example of which we may cite State v. *331 Wynne, 353 Mo. 276, 182 S.W.2d 294. In the case presently before us, as has already been stated, the device used by the District Attorney conformed in all respects as to measurement of distances and in all other respects also, to the testimony that had been adduced by the State before the jury. Moreover, upon counsel's complaint the court offered them to inspect the device themselves and to check the measurements and even offered them the privilege of rebutting the conclusions drawn by the District Attorney from his use of it, all of which they declined to do.
Article 381 of our Code of Criminal Law and Procedure, LSA-R.S. 15:381, prescribes that "Counsel may argue to the jury both the law and the evidence of the case, but must confine themselves to matters as to which evidence has been received, or of which judicial cognizance is taken, and to the law applicable to the evidence; and counsel shall refrain from any appeal to prejudice." Article 382, LSA-R.S. 15:382, provides that "Counsel have the right to draw from the evidence received, or from the failure to produce evidence shown to be in the possession of the opposite party, any conclusion which to them may seem fit, but counsel have no right to draw from such evidence or suppression of evidence an incorrect conclusion of law."
As a fundamental proposition the law aims to prevent anything which may tend to be prejudicial to the accused and we infer from the articles quoted that as long as counsel confine themselves to a discussion of the evidence, and that includes a discussion by way of demonstrations and illustrations drawn from the evidence adduced, there is no prejudice. Our thorough consideration of the matter in so far as it was involved in this case convinces us that no prejudicial error arose out of the use of the device by the District Attorney in his effort to make an application of the evidence which had been introduced and therefore there is no merit in bill of exception reserved thereto.
Bill of Exception No. 8 was reserved to the court permitting the sheriff rather than the Clerk of Court to poll the jury. Under Article 417 of the Louisiana Code of Criminal Procedure, LSA-R.S. 15:417, the function of polling a jury is that of the Clerk. In explaining why the variation took place the trial judge states in his per curiam that when the jury was ready to report their verdict the Deputy Clerk was absent as he had gone to obtain something to eat. We assume from this remark that it was a Deputy Clerk instead of the Clerk who was in attendance at the court proceedings. The per curiam further states, however, that the Clerk was also absent, so that is why the sheriff was requested to poll the jury. Whatever merit there may be in this bill we note that the judge's per curiam states that no objection was made at the time when the jury was polled by the sheriff. In the absence of any objection or a bill having been reserved this court is without right to review counsel's complaint.
Bill of Exception No. 9 was reserved to the court's overruling defendant's motion for a new trial. This motion was based on the foregoing alleged errors, and on the additional fact that the jury was not kept separate and apart from outside contacts and were permitted to roam on the upper floor of the jail at will. In his per curiam, the trial judge states that such facts as were stated in the bill of exception were not borne out by any evidence in the record and that the burden of proving that such conditions did exist was upon the defendant. The record is barren of such evidence and in the absence of any, the per curiam of the trial judge must be accepted as true by this court.
Bill of Exception No. 10 was reserved to the court's overruling defendant's motion in arrest of judgment on the ground that in the verdict returned by the jury the word "capital" was misspelled. The verdict as returned reads: "We, the Jury, find the accused guilty without captial punishment." The verdict of the jury was one of guilty. In cases where capital punishment may be exacted the judge instructs the jury that they may, in their discretion, qualify their verdict of guilty with the words "without capital punishment", which in effect is a clemency which the jury in its discretion, exercises toward an accused *332 convicted of a capital crime. That is what was meant by the verdict in this case regardless of the misspelling of the word "capital". The case of State v. Gueringer, 209 La. 118, 24 So.2d 284, relied on by counsel for defendant can readily be distinguished from the instant case because there, the misspelled word was a necessary part of the responsive verdict and the manner in which it was returned, the verdict was meaningless. In the present case the phrase "without capital punishment" was merely to qualify the verdict of guilty and was not necessary to the verdict itself which, as stated, was one of guilty.
For a thorough discussion of the rule regarding the phraseology and the spelling of words in verdicts rendered by a jury in a criminal case, see State v. Broadnax, 216 La. 1003, 45 So.2d 604.
There is no merit to the various bills of exception and the sentence and conviction appealed from are hereby affirmed.
McCALEB, J., dissents from refusal of rehearing.