817 So.2d 500 (2002)
STATE of Louisiana
v.
Mark HUTCHINSON.
No. 02-KA-0060.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 2002.
Rehearing Denied June 3, 2002.
*501 Bruce G. Whittaker, Louisiana Appellate Project New Orleans, LA, Counsel for Mark Hutchinson, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, Parish of Jefferson, LA, Terry M. Boudreaux, Churita H. Hansell, Assistant District Attorneys-Appellate Counsel, Bradley R. Burget, Assistant District Attorneys-Trial Counsel, Gretna, LA, Counsel for State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
SUSAN M. CHEHARDY, Judge.
On July 27, 2000, the Jefferson Parish District Attorney filed a bill of information charging defendant, Mark Hutchinson, with simple robbery, a violation of LSA-R.S. 14:65. Defendant was arraigned on July 31, 2000 and pled not guilty.
After a three-day trial, which began on October 17, 2000, the six-member jury unanimously found defendant guilty as charged. Defendant filed a motion for new trial on October 24, 2000, which was denied on October 25, 2000.
On January 12, 2001, the trial court sentenced defendant to imprisonment at hard labor for seven years to run consecutively *502 to any other sentence the defendant was serving. On January 16, 2001, defendant filed a motion to reconsider sentence, which was denied the next day. Defendant filed a motion for appeal on January 19, 2001, which was granted.[1]
On March 15, 2001, the state filed a multiple offender bill of information alleging defendant to be a third felony offender. On that same day, defendant denied the allegations of the multiple bill. On October 18, 2001, however, defendant stipulated to being a second felony offender. The trial court then vacated the defendant's original sentence and imposed an enhanced sentence of imprisonment at hard labor for 12 years.

Facts
On June 24, 2000, Kevin James was working for Mr. Jim's Pizza as a delivery person. At approximately 10:30 p.m., Kevin James was on the way to deliver his last pizza of the night, which was for 525 Taylor Street in Kenner. He drove down Jefferson Highway, which turns into 3rd Street. As he was reached Taylor Street, a man flagged James down.
James pulled into the driveway of a duplex at the corner of Taylor and 3rd Streets, exited his vehicle and asked the man for his address to verify that he was the person that had ordered the pizza. The man told James that his girlfriend was upstairs but that she would be coming down with the money. When James looked to see if anybody was coming, the man implied that he had a weapon underneath his shirt or in his pocket, reached into Mr. James' pocket and stated that he was going to harm James if James did not give him money.
The man then entered James' truck through the open driver's side door. He kept his left hand in Mr. James' left pocket while he searched the truck with his right hand. He threatened to "trash" James' truck if James did not give him the money. James agreed to give him money if the man exited his vehicle and left him alone. The assailant then exited James' truck, but still kept his left hand in James' left pocket.
At this point, a woman standing on the balcony of the duplex asked James if he was okay but James didn't answer. The assailant then hit James in the jaw. During this altercation, James' cell phone fell to the ground and he immediately reached to the ground to retrieve his phone. When James was reaching down, the man swung again, but missed.
A bystander then intervened and pushed the attacker away from James. At that moment, the attacker ran away. James discovered that the man had taken $34.00 out of his left pocket during the incident. At the bystander's insistence, James called the police who arrived approximately 10 to 15 minutes later.
When Officer Anthony Woodson of the Kenner Police Department arrived, James described his attacker as a tall black man, approximately 6 feet tall and weighing approximately 180 pounds, wearing a pinkish color shirt with blue jeans. James also stated that the man hit him in a feminine way and ran away in a feminine manner. Witnesses, who did not want to be identified, told Officer Woodson that the assailant fled southbound on Taylor Street towards 3rd Street and, as he fled, he threw a bottle into some bushes.
*503 Officer Woodson testified that the description of the perpetrator reminded him of a disturbance call he had received earlier that day. Between 5:30 and 6:00 p.m. that day, he responded to a domestic disturbance call at 339 Webster Street. Although the call did not involve the man the witnesses described, Woodson remembered observing a man wearing blue jeans and a pinkish, reddish-colored, dark-collared shirt about two houses away walking towards 339 Webster Street as Woodson was leaving the house. Woodson thought that the man had a feminine demeanor because he was standing in a way that a man wouldn't normally stand, with his hand on his hip.
After Officer Woodson obtained the information from James, he broadcast the description of the suspect to all the units and he dispatched other officers to go to 339 Webster Street, which was about two blocks away. While Woodson was still at the crime scene, he learned that other officers had detained a possible suspect.
In the meantime, Officer Brian Labruzza of the Kenner Police Department, in response to Officer Woodson's radio dispatch, went to 339 Webster Street to locate the suspect who was described as a black male, approximately 6'2" and weighing approximately 210 to 240 pounds. When Officer Labruzza along with Officer Lacrouts knocked on the door of 339 Webster Street, the owner of the residence, answered the door and gave the officers permission to enter the residence.
When he entered the residence, Officer Labruzza saw a man who matched the description of the suspect, lying on a sofa inside the residence, wearing blue jeans and no shirt. When the man stood up at Labruzza's request, Officer Labruzza noticed a pinkish, reddish-colored shirt lying underneath him on the sofa. Labruzza saw that the shirt on the sofa matched the description of the shirt worn by the perpetrator. Officer Labruzza detained the suspect and escorted him outside the residence where he asked the suspect to put on the shirt. With the owner's permission, Officer Lacrouts searched the immediate area and found currency totaling between $30.00 and $38.00 and a Louisiana Purchase Automated Benefit Card in the name of Annette Sims underneath the sofa where the suspect had been reclining. Lacrouts did not take possession of the card and currency but secured the area until a crime scene officer could photograph the area and seize the evidence.
Once the suspect was detained, Labruzza notified Woodson that he had a possible suspect. Woodson then transported James to Webster Street in his patrol car. When Woodson and James arrived, Woodson parked his police vehicle about two to three car lengths from Officer Labruzza who was standing next to the suspect in front of a marked police car in the middle of the street. Both officers testified that there was a streetlight in the area and also that Officer Woodson shined a spotlight on the suspect during the identification to illuminate him and to prevent him from seeing the person that was identifying him.
Officer Woodson stated that, as they pulled up to 339 Webster Street, James, who was in the back of the patrol car, immediately identified the suspect as the man who robbed him earlier that evening. James was confident of the identification because he got a good look at his assailant during the two to three minutes in which the robbery occurred. Further, he estimated that about 30 minutes elapsed from the time the robbery occurred to the time that he made the identification two blocks away.
After the identification, Officer Labruzza advised defendant he was under arrest. He put defendant in his police car and *504 brought him to jail. Once defendant was at Kenner Lockup, Officer Labruzza read him his constitutional rights and defendant signed an advice of rights form indicating that he understood his rights.
Officer Ronald Lussiere, a corrections officer at Kenner Lockup took possession of the defendant's clothes after the defendant was arrested. Officer Lussiere identified state's exhibit 5 as the chain of custody of evidence form which indicated that he obtained a pair of blue jeans and a red and white shirt from defendant. He also specifically remembered from his personal recollection that defendant wore those clothes. After Officer Lussiere took the articles of clothing, he put them in a bag, sealed them, and turned them over to Officer Woodson who then turned the bag over to the crime scene technician.
Officer Edward Rohde, a crime scene technician with the Kenner Police Department, went to 339 Webster Street to collect evidence on the evening of June 24, 2000. Evidence that he collected from the scene included a twenty-dollar bill, a five-dollar bill, nine one-dollar bills, a Louisiana Purchase card in the name of Annette Sims and a beer bottle from bushes near the scene. He testified that palm prints were lifted from the bottle; however, after a print comparison, there were no known palm prints on file for the subject listed.
In addition to the evidence that he personally collected at the scene, Officer Rohde also collected a bag of clothes from Officer Woodson at the crime scene office. Rohde logged all of the evidence into the crime scene evidence locker. The currency was photocopied and returned to James. Officer Rohde testified that the bags containing the clothing did not leave the evidence locker until they were checked out for court.
In court, James identified the defendant as the man who robbed him. Woodson also positively identified defendant in court as the man who the victim had identified that night. James identified state's exhibit 1 as the pinkish color shirt that defendant was wearing on the night of the robbery and state's exhibit 2 as the blue jeans that the defendant was wearing that night.
Officer Labruzza identified state's exhibit 1 as the shirt which defendant was lying on that evening and state's exhibit 2 as the blue jeans that defendant had on when he was taken into custody. Labruzza also stated that, while defendant was detained, defendant did not take off his jeans and put on another pair. Officer Woodson identified state's exhibit 1 and state's exhibit 2 as the shirt and jeans that he received from Officer Lussiere at Kenner Lockup after the defendant was booked. He further indicated that the exhibits were the same that he turned over to Officer Rohde.
Based on the evidence and testimony, the six-member jury found the defendant guilty as charged of simple robbery. Defendant appeals his conviction and sentence.
In his first assignment of error, defendant argues that he was prevented from presenting a defense at trial. Particularly, while defendant concedes that the State "proved that [he] was wearing the clothing worn by the perpetrator, in particular, a pair of jeans and a red shirt," he contends that the trial judge erred in ruling that he could not try on the jeans and present himself to the jury without taking the witness stand and waiving his privilege against self-incrimination. Defendant also contends that the trial court erred by refusing to allow a proffer of the desired evidence.
At trial, defense counsel was cross-examining the victim, Kevin James, about his description of the assailant, specifically the *505 blue jeans that James' stated that the robber was wearing. Defense counsel asked James to look at the label in the jeans and read the label to the jury. James read the label which indicated that the jeans were made by Levi Strauss and Company with a waist size of 34 and a length of 30.
Defense counsel then requested that the defendant stand up so he could hold up the jeans next to him and show they wouldn't fit. The State objected, arguing that defendant "does not get to stand up and demonstrate and testify without opening his mouth." Defense counsel then requested that defendant be allowed to try on the jeans to show that they wouldn't fit. The State agreed to the demonstration only if defendant took the stand and was subject to cross-examination.
Initially, the trial judge decided that he was going to allow defense counsel to hold up the jeans against defendant. The State strenuously objected. After additional argument, the trial judge ruled that the demonstration would be improper. He agreed with the State that defendant would have to take the stand if he wanted to try on the jeans.
During defense counsel's closing argument, defense counsel asked defendant to stand up. The State objected, arguing that defendant couldn't stand up without taking the stand. The trial judge ruled defense counsel could hold up the jeans, but he could not stand close to defendant while doing so. Defense counsel continued with his argument and asked defendant to stand up again. He argued that defendant could not fit in the size 34 jeans, and that, "Certainly you gentlemen ought to know what you fit in and what you don't and tell yourselfYou're bigger than him."
A criminal defendant has a constitutional right to present a defense.[2] As stated in State v. Casey,[3] "To this end, a defendant should be allowed to present evidence on any relevant matter. However, the right to present a defense is not without limits and the state retains a legitimate interest in barring unreliable evidence from criminal trials."
LSA-C.E. art. 402 provides that "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." Relevant evidence is defined in LSA-C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Although evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.[4]
It is well settled that the requirement of exhibiting identifying characteristics is demonstrative, rather than testimonial evidence, and is not violative of the Fifth Amendment right against compulsory self-incrimination.[5] In Schmerber v. California,[6] *506 the United States Supreme Court held that evidence of analysis of petitioner's blood taken over his objection was not inadmissible on the ground that it violated defendant's privilege against self-incrimination. There, the Supreme Court stated:
It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling `communications' or `testimony,' but that compulsion which makes a suspect or accused the source of `real or physical evidence' does not violate it.[7]
This distinction between an act which communicates and an act which merely makes an accused's physical characteristics the subject of evidence has been consistently applied in Fifth Amendment analysis. In Gilbert v. California,[8] the United States Supreme Court held that the taking of a handwriting sample did not violate the accused's Fifth Amendment privilege. On the same day that Gilbert was handed down, the United States Supreme Court likewise held that the Fifth Amendment privilege against self-incrimination was not violated when the state required the defendant accused of a bank robbery to utter the words used by the robber.[9] Finally, in United States v. Dionisio,[10] the Court held that requiring a defendant to produce voice exemplars was constitutionally acceptable because the voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said.
Louisiana courts have similarly allowed the State to compel a criminal defendant to exhibit his physical features without finding an infringement of his privilege against self-incrimination. Louisiana courts have compelled a defendant to put on a shirt,[11] to allow his height to be measured,[12] and to exhibit a scar,[13] a bruise,[14] and a tattoo.[15] Defendants in Louisiana have been forced to stand and identify themselves,[16] to give blood samples[17] and handwriting samples,[18] to demonstrate *507 the manner in which they open cigarette packs,[19] and to say the words used by the robber who committed the crime.[20] In State v. Morgan,[21] defendant argued that when the trial judge required him to put on a particular shirt at the trial, defendant's privilege against self-incrimination was violated. The supreme court found no merit to the asserted error, but did state as follows:
With respect to assignment of error number seven we note for the purpose of accuracy that the basis of the objection was merely that the shirt was "filthy," not that the state's action violated defendant's fifth amendment privilege, and also that the defendant had admitted before he put on the shirt that it belonged to him. With respect to the fifth amendment and non-verbal acts, see Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); State v. Wilson, 329 So.2d 680 (La.1976).[22]
Finally, the use of demonstrative evidence is within the sound discretion of the trial judge and his ruling will not be disturbed on appeal in the absence of an abuse of discretion.[23]
In this case, if the State had requested that the defendant try on the jeans in question for the jury, it is likely under prevailing federal and state jurisprudence that the defendant would have been required to do so, notwithstanding an effort on his part to invoke his constitutional privilege against self-incrimination, since the donning of jeans would not have been a communication but merely a display of a physical characteristic. Defendant's act in putting on the jeans would simply have made one of his physical characteristics the subject of evidence and, as such, would not have been protected by his right against self-incrimination.
Further, if defendant had engaged in such a demonstration, it would *508 not have constituted a waiver of his privilege against self-incrimination.[24] Waiver of this privilege is accomplished when a defendant voluntarily takes the stand to testify in his own behalf. Once a defendant knowingly and intelligently waives his privilege, he is subject to cross-examination on the whole case like any other witness.[25] However, defendant's request to reveal a physical characteristic would not have been testimony on his behalf. Therefore, his proposal to demonstrate the fit of the jeans would neither waive his Fifth Amendment rights nor expose him to cross-examination.
Here, the trial judge ruled that, to try on the jeans, the defendant had to take the witness stand, which would result in waiver of his privilege against self-incrimination and expose him to cross-examination. While we find that the ruling was in error, we also find that the trial judge's refusal to allow the demonstration was not in error. Here, we cannot say that the evidence that defendant sought to introduce through the demonstration, that the defendant could not fit in the jeans on the day of trial, was relevant.
By the defendant's own admission, the State proved at trial that defendant was wearing those particular jeans on the day he committed the crime, the relevant date for this inquiry. James, the victim, testified that defendant was wearing the blue jeans in question when defendant robbed him. Officer Labruzza testified that, when he initially observed defendant lying on the sofa in the residence at 339 Webster Street, he was wearing blue jeans, which the defendant continued to wear the entire time he was in Labruzza's presence. Labruzza also identified the jeans introduced by the State into evidence as the blue jeans defendant had on the night of the robbery.
Officer Lussiere testified that, when the defendant was booked into the Kenner Lockup, he took possession of defendant's blue jeans and shirt. After he obtained the items, he put them in a bag, sealed them, and turned them over to Officer Woodson. Officer Lussiere testified that he specifically remembered that defendant wore those particular blue jeans. Officer Woodson testified that he obtained a bag with clothing from corrections officer at Kenner Lockup, which he turned over to the crime scene technician. Officer Rohde, the crime scene technician, testified that he collected a pair of Levi blue jeans, waist size 34, length 30, among other things, from Officer Woodson. Officer Rohde testified that he brought the evidence, including the blue jeans, back to the office and logged it into the crime scene evidence locker. He further stated that the bags containing the clothing did not leave the evidence locker until they were checked out for court.
The victim's testimony as well as the officers' testimony regarding the unbroken chain of custody of the blue jeans was corroborated by the chain of custody form, which was also introduced into evidence. We are not persuaded that the defendant was prevented from introducing any relevant evidence when the trial court refused to allow him to try on the blue jeans introduced by the State. In addition, although the trial judge did not allow defendant to put on the jeans, he did allow defense counsel during closing argument to hold up the blue jeans and allowed defendant to stand up at the same time *509 although not next to each other, so the jury could compare the size of the jeans to defendant's body and determine whether they thought the jeans would fit. Defense counsel was also allowed to and did argue that the jeans would not fit defendant because they were too small. Therefore, even though the demonstration was excluded, the defendant was still permitted to argue that the jeans in question could not fit him. For the foregoing reasons, we find defendant's first assignment of error merits little consideration.
In his second assignment of error, the defendant asks for review of the record for errors patent. Our review indicates that, at the multiple offender sentencing, the trial court did not properly inform the defendant of the commencement date of the two-year period within which to file an application for post-conviction relief.
La.C.Cr.P. art. 930.8 provides that a court shall not consider an application for post-conviction relief, including applications which seek an out-of-time appeal, if the application is filed more than two years after the judgment of the conviction and sentence has become final. Therefore, we remand to the district court with instructions to inform the defendant of the proper provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that defendant received the notice in the record of the proceedings.[26]
AFFIRMED; REMANDED.
NOTES
[1] Defendant's motion for appeal was premature when it was filed after conviction and sentence, but before imposition of his enhanced multiple-offender sentence. That procedural defect was cured, however, by the subsequent resentencing. State v. Balser, 96-443 (La.App. 5 Cir. 11/14/96), 694 So.2d 351.
[2] La. Const. art. I, § 16.
[3] 99-0023 (La.1/26/00), 775 So.2d 1022, 1037(citations partially omitted).
[4] LSA-C.E. art. 403. See also, State v. Ludwig, 423 So.2d 1073 (La.1982).
[5] State v. Martin, 519 So.2d 87 (La.1988), appeal after remand, 558 So.2d 654 (La.App. 1 Cir.1990), writ denied, 564 So.2d 318 (La. 1990); State v. Gilmer, 604 So.2d 117, 120 (La.App. 2 Cir.1992).
[6] 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).
[7] 384 U.S. at 763-64, 86 S.Ct. at 1832 (citations omitted).
[8] 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).
[9] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[10] 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).
[11] State v. Morgan, 333 So.2d 642 (La.1976).
[12] State v. Roy, 220 La. 1017, 58 So.2d 323 (1952).
[13] State v. Anthony, 332 So.2d 214 (La.1976).
[14] State v. Washington, 294 So.2d 794 (La. 1974).
[15] State v. Wilson, 329 So.2d 680 (La.1976).
[16] State v. Jones, 261 La. 422, 259 So.2d 899 (1972).
[17] State v. Dugas, 252 La. 345, 211 So.2d 285 (1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 679, 21 L.Ed.2d 691 (1969).
[18] State v. Thompson, 256 La. 934, 240 So.2d 712 (1970).
[19] State v. O'Conner, 320 So.2d 188 (La. 1975).
[20] State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970).
[21] 333 So.2d 642 (La.1976). In State v. Brooks, defendant complained that the trial court erred in requiring him to put on clothes allegedly worn by him during the commission of the crimes. During defense counsel's cross-examination of the police officer who seized the clothing in question, the detective was asked twice whether anyone had ever asked defendant to try on the jean shorts in evidence to "see if they fit him," "or see if they weren't too little or too big, or whether they fit him at allor anything like that."

When the State raised the issue of defendant trying on the clothes, defense counsel objected, arguing that it violated defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to confrontation. Defense counsel also argued that the wearing of the jean shorts would not be relevant unless defendant wore them so that they extended below his knee, as defense counsel alleged the victim had testified he had worn them.
The trial court ruled that defense counsel had opened the door to such evidence in her questioning of Detective Winins. The trial court also held that the Fifth Amendment did not cover the situation at hand.
On appeal, defendant argued that, under LSA-C.E. art. 403, the trial court erred in requiring the demonstration because the probative value was substantially outweighed by the danger of unfair prejudice, a new objection. The appellate court concluded that defendant could not argue that ground on appeal because he did not object to the ruling at the trial court level on that ground. State v. Brooks, 758 So.2d at 818-819.
[22] Id. at 643.
[23] State v. Alexander, 602 So.2d 291 (La.App. 2 Cir.1992), writ denied, 92-2674 (La.4/22/94), 637 So.2d 151. See also, State v. Barnes, 489 So.2d 402 (La.App. 5 Cir.1986), writ denied, 494 So.2d 1174 (La.1986).
[24] State v. Martin, 519 So.2d 87 (La.1988), appeal after remand, 558 So.2d 654 (La.App. 1 Cir.1990), writ denied, 564 So.2d 318 (La. 1990).
[25] LSA-R.S. 15:462.
[26] State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975.